**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

| | | |
|---|---|---|
| **MAVERICK GROUP MARKETING, INC.,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| **v.** | ) | |
| | ) | |
| **WORX ENVIRONMENTAL PRODUCTS, INC.,** | ) | **Case No.: 2:13-cv-02268-tmp** |
| **WORX ENVIRONMENTAL PRODUCTS, LTD.,** | ) | |
| **WORX ENVIRONMENTAL PRODUCTS OF** | ) | |
| **CANADA, INC.,** | ) | |
| | ) | |
| **Defendants/Counter-Plaintiffs,** | ) | |

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

Before the Court are the parties' cross-motions for summary judgment. First, On January 8, 2015, Defendants Worx Environmental Products, Ltd., Worx Environmental Products of Canada, Inc., and Worx Environmental Products, Inc. (collectively, "Worx") filed a Motion for Summary Judgment on the claims asserted by Plaintiff Maverick Group Marketing, Inc. ("Maverick"). (ECF No. 56). Maverick responded on February 4, 2015 (ECF No. 62), to which Worx replied on February 18, 2015. (ECF No. 67). Second, on January 13, 2015, Maverick filed its Motion for Summary Judgment. (ECF No. 58). Maverick's Motion seeks partial summary judgment on its claims against Worx and full summary judgment on Worx's counterclaims against Maverick. Worx filed its Response on February 10, 2015 (ECF No. 64), to which Maverick filed its Reply on February 27, 2015. (ECF No. 69).

## FAILURE TO COMPLY WITH LOCAL RULES

Local Rule 56.1(a) mandates that each party should provide a "separate, concise statement of material facts as to which the moving party contends there is no genuine issue for

1

trial." That *concise* statement of facts "shall not exceed 10 pages without prior Court approval." Maverick's Statement of Undisputed Facts, affixed to its Motion for Summary Judgment, contains 92 separately numbered paragraphs and spans 13 pages without prior court approval. Although the Court here considers the additional material, such a voluminous statement of facts containing issues irrelevant to the legal questions presented for summary judgment is inappropriate.

More importantly, in responding to its opponent's statement of facts, each party took some liberty in presenting its case rather than simply disputing a statement and citing to the record, as required by the Local Rule. Argument in responses to statements of material facts clouds issues and encumbers the court with motions-within-motions. Furthermore, the parties' lengthy, conclusory statements of fact left the Court with little room to begin to discuss questions of law: in total, the Court counts only 29 out of a possible 162 "facts" as simply "undisputed." Most of these uncontested facts are references to dates, the death of certain witnesses, each company's business purpose, and general statements about the relevant actors.

## BACKGROUND

Worx is a manufacturer of environmentally-friendly cleaning products. (Worx's Statement of Undisputed Facts ¶ 1, ECF No. 56-2). Maverick is a marketing company whose sole owner is John Garrison. (*Id.* ¶ 2). On February 12, 2007, Maverick and Worx executed a Marketing Agency Agreement (the "Agreement"), which forms the basis for this lawsuit. (Maverick's Statement of Undisputed Facts ¶ 8, ECF No. 59). From this point on, the parties essentially "dispute" every material fact in question, but some facts are clear. After the parties executed the Agreement, Maverick began its attempt to establish a relationship with Wal-Mart, one of Maverick's accounts, for the benefit Worx. At some point in 2007 or 2008, a previous

outside consultant named Sergio Abarca became Worx's Vice President. (*Id.* ¶ 36). Garrison continued to pursue a business relationship with Wal-Mart and communicated with Abarca during the process. Abarca also began contacting Wal-Mart on his own. On February 2, 2009, Abarca drafted a letter to Garrison and sent it as an email attachment on February 8, 2009. Worx claims that this letter terminated the Agreement. Garrison and Abarca had some communication after the February 8 email until Abarca sent another email purporting to terminate the Agreement on March 10, 2009. Maverick claims that this email terminated the Agreement, if the Agreement was terminated at all. Maverick then ceased communication with Wal-Mart and Worx.

Abarca continued to pursue Wal-Mart business, as evidenced by a string of emails between Abarca and Wal-Mart buyer Zach Freeze. The parties dispute the legal significance of these emails with regard to whether they imply that an "order" had been "solicited" under the Agreement. In a July 2, 2009 email, Abarca wrote to several Worx employees: "We just finished the teleconference with Wal-Mart. I am pleased to announce that we got a three-year contract. It is also confirmed that there are a total of 3,100 centers that we will service." (*Id.* ¶ 61; Email from Sergio Abarca to Jack Neufeld et al. (July 2, 2009, 9:42 AM), ECF No. 60-2, PageID 630).[1] On July 31, 2009, Wal-Mart ordered 3,118 cases of Worx product and sent a Production Notice. (Maverick's Statement of Undisputed Facts ¶ 63). On August 25, Wal-Mart received shipments of Worx product. (*Id.* ¶ 64). On August 26, Wal-Mart drafted an "award letter" to Worx. (*Id.* ¶ 65). Worx never paid commissions to Maverick.

Maverick filed its complaint in the Chancery Court of Shelby County, Tennessee on March 27, 2013, and Worx removed the action to this Court on May 1, 2013. (ECF No. 1).

---

[1] Although Worx "disputed" this fact "as stated," it does not dispute that Abarca actually sent this email. Instead, it argues that it "received a three-year Supplier Agreement from Wal-Mart on August 26, 2009." Worx's Responses to Maverick's Statement of Undisputed Facts ¶ 61, ECF No. 65.

Maverick then filed an Amended Complaint with Court approval on September 18, 2013. (ECF No. 41). The Amended Complaint seeks damages for breach of contract and unjust enrichment, as well as declaratory relief. Worx answered and counterclaimed, asserting that Maverick breached the agreement, misrepresented a material fact, and committed fraud. (ECF No. 24, 42). Maverick claims that it is entitled to commissions under the Agreement's provisions for post-termination commissions on "orders solicited," discussed in detail below. Worx, on the other hand, claims that Maverick never solicited any orders and therefore is not entitled to commissions under the Agreement. Whether Maverick is entitled to commissions also hinges on timing: the Agreement provides for commissions on "orders solicited prior to the effective date" of termination. That effective date of termination is 120 days from effective notice.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] In reviewing a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party,[3] and it "may not make credibility determinations or weigh the evidence."[4] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a

---

[2] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).

[3] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[4] *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

genuine issue for trial."[5]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[6]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[7]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[8]  In this Circuit, the nonmoving party must "put up or shut up" as to the critical issues of the claim.[9]  The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[10]

## DISCUSSION

**I. The Agreement**

### A. Which "Agreement" Controls

Worx's fraud claim, discussed thoroughly below, alleges that Garrison, on behalf of Maverick, sent an altered Agreement to Abarca.  In its Response, Worx asserts that "a dispute

---

[5] *Celotex*, 477 U.S. at 324.

[6] *Matsushita*, 475 U.S. at 586.

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[8] *Id.* at 251–52.

[9] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[10] *Celotex*, 477 U.S. at 322.

exists as to the authenticity of the Agreement."[11]  Moreover, in its Answer to Maverick's Complaint, Worx frequently "denies the authenticity and validity of the Agreement attached to the Second Amended Complaint as Exhibit A."[12]  At the same time, Worx "admits that it entered into an Agreement with Maverick on or about February 12, 2007."[13]  It further admits, for the purposes of its own Motion for Summary Judgment, that "the relevant provisions, Paragraphs Four (4) and Six (6) are the same in each version" of the Agreement.[14]  Worx uses the Agreement before the Court in each of its arguments, only to challenge the "authenticity and validity" of the "altered" Agreement when it comes to its own fraud claim.  Therefore, the parties agree that they are bound by the relevant language in the Agreement.  Worx's allegation of fraud is based on an alleged misrepresentation that did not alter the validity of the February 12, 2007 Agreement.  The Court further addresses the fraud argument below.

## II. Commissions

### A.  Contract Interpretation

Above all, "[i]n 'resolving disputes concerning contract interpretation, [the Court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.'"[15]  But "[a] court's initial task in construing a contract is to determine

---

[11] Worx's Response in Opp'n to Maverick's Mot. Summ. J. 13, ECF No. 64.

[12] *See* Answer to Second Am. Compl. ¶¶ 13–15, ECF No. 42.

[13] *Id.* ¶ 12.

[14] Worx's Statement of Undisputed Facts at 2 n.1, ECF No. 56-2.

[15] *Planters Gin. Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890–91 (Tenn. 2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). The Agreement is subject to the laws of Tennessee, and therefore the Court applies Tennessee law.  Marketing Agency Agreement ¶ 7, ECF No. 61-1.

whether the language of the contract is ambiguous."[16]  Second, if the contract is ambiguous, Tennessee courts apply "established rules of construction to determine the parties' intent."[17] Finally, "'[o]nly if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning of the contract] become a question of fact' appropriate for a jury."[18]  The Court is concerned with the intent of the parties at the time of contracting.  Such intent "is presumed to be that specifically expressed in the body of the contract,"[19]  but when a contractual provision is "susceptible to more than one reasonable interpretation, [it] renders the terms of the contract ambiguous."

## B.  The MANA Code of Ethics

The parties concede that the Agreement—or at least the provisions relevant to this action—is binding.  At the end of the Agreement, below the signature lines and in a separate text box, are 15 "accords" under the heading "MANA [Manufacturers' Agents National Association] Code of Ethics."  Maverick claims that Worx breached the Agreement in failing to abide by the MANA Code of Ethics.  Worx responds that these provisions represent an "aspirational code of conduct," which the parties did not intend to be binding.  Maverick counters that the provisions were on the face of the Agreement and drafted by Worx, and therefore both parties intended the terms to be binding.  This case represents the unusual circumstance in which the non-drafter of a contract seeks the inclusion of terms appended to the contract.  When determining whether the

---

[16] *Planters Gin Co.*, 78 S.W.3d at 890.

[17] *Id.*

[18] *Id.* (quoting *Smith v. Seaboard Coastline R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981)); *see also* Steven W. Feldman and James A. DeLanis, *Resolving Contractual Ambiguity in Tennessee: A Systematic Approach*, 68 Tenn. L. Rev. 73, 79–89 (2000).

[19] *Planters Gin Co.*, 78 S.W.3d at 890.

parties intended the MANA Code of Ethics to be binding contractual language, the Court must "judge[] by an objective standard, *i.e.*, what a reasonable onlooker would conclude the parties intended from the words expressed in the instrument."[20]  Despite the inclusion of the words below the signature line, no reasonable mind could conclude that the parties intended to be bound by the MANA terms.

First, the format of the document shows that the parties could not have intended to include the MANA terms as contractual provisions.  While not determinative, every provision of the Agreement other than the MANA provisions is listed above the signature line.  The Code of Ethics is separately numbered and confined in a text box in a different format, contains check-boxes next to each provision, and is not referenced anywhere in the body of the Agreement. Maverick points to *American General Equity Services Corp. v. Schablick*, in which the Tennessee Court of Appeals enforced a bolded arbitration provision on the back side of the Agreement.[21]  But in that case, the body of the contract contained the following language: "Notice: This document contains a pre-dispute arbitration clause, which appears on the reverse side at paragraphs 13 and 14."[22]  More importantly, the terms on the reverse side of that contract were in standard contractual language, clearly showing the parties' intent to impose duties and conditions with respect to arbitration.  Maverick also presents *Staubach Retail Services-Southeast, LLC v. H.G. Hill Realty Co.*, in which the court enforced an unsigned, separate

---

[20] *Richards v. Taylor*, 926 S.W.2d 569, 571 (Tenn. Ct. App. 1996) (citing *Cross v. Earls*, 517 S.W.2d 751, 752 (Tenn. 1974); *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1975)).

[21] *See Am. Gen. Equity Servs. Corp. v. Schablick*, No. M2004-03011-COA-R9-CV, 2005 Tenn. App. LEXIS 719, at *5–6 (Tenn. Ct. App. Nov. 17, 2005).

[22] *Id.* at *5.

brokerage agreement as part of a contract.[23]   Again, unlike the Agreement in this case, the

contract in *Staubach* included express terms referencing the extrinsic agreement, which also

included standard contractual duties and conditions.  The MANA Code of Ethics is what it says

it is—a code of ethics.  It is not referenced in the Agreement and, from the face of the document,

was not intended to be enforceable.

Second, the language of the Code of Ethics indicates that the provisions were not

intended to be enforceable terms of the contract.  The provisions are more akin to a corporate

mission statement or institutional policies than obligation-imposing contractual terms.  Several

examples illustrate the code's aspirational tone.  First, the third bulleted section includes four

privileges to be accorded "one Manufacturer's Agent by another."  No third-party "agent" is

mentioned anywhere in the Agreement, which sets forth the relationship between Worx and

Maverick.  Under this same third section, the Code of Ethics calls for unknown third-party

agents to "cooperate" "by supporting the National Association established for that purpose,

subscribing to its aims and objectives, and in  every practical way working to advance the

marketing interests of all Manufacturers' Agents and their Principals."[24]  This provision cannot

bind either party.  Next, the provisions include vague duties like "[g]ive the Manufacturer the

same loyal service as the Agent, operating its own business, expects from its own employees"

and "[c]onscientiously cover the territory assigned," without ever defining the "expectations"

that Maverick demands of its own employees or what would fall below a standard of

---

[23] *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 523, 526 (Tenn. 2005).

[24] Marketing Agency Agreement 3, ECF No. 61-1.  All quotations in this paragraph are references to the Marketing Agency Agreement.

"conscientiousness."  Finally, neither party points out that the body of the Agreement not once refers to Worx as "Manufacturer," but instead defines Worx as "Principal."

Third, the bulleted list often refers to how a party subscribing to the MANA Code of Ethics should draft a representation agreement, rather than how the parties should perform under the Agreement in question.  For example, one of the duties "[t]o be accorded the Agent by the Manufacturer" is that the "Manufacturer" "[e]nter into a fair and clearly worded written agreement with the Manufacturers' Agent."[25]  In arguing that Worx breached the Agreement's stated termination procedure, Maverick points to a MANA term purportedly making the agreement cancellable after the first year only for failure to comply with terms.  The provision referenced asks the "Manufacturer" to "*[m]ake* the agreement cancellable by either party during its first year on suitable advance written notice, but subsequently only for failure of either party of either party to comply with its terms, or by mutual consent."  But neither Worx nor Maverick did make the Agreement cancellable in this manner.  Instead, unambiguously set forth in the "Term" paragraph is the provision for termination by notice at any time.  Another example is a provision requiring the "Manufacturer" to "[a]gree to practical and dignified means for friendly arbitration of all controversial points that may arise."  Neither party presents evidence that it agreed to or attempted arbitration in the more-than-three-year period between alleged termination and the filing of the complaint in this matter.  The Code of Ethics was a guideline for drafting the contract, and therefore the parties did not intend it to be binding.[26]  It must follow that each of Maverick's allegations of breach based on the MANA terms fails as a matter of law.

---

[25] *Id.*

[26] Even if the Court deemed the contract ambiguous as to the MANA terms' inclusion as enforceable terms, some of the relevant provisions—especially the one governing termination— are "so repugnant" to the prior provisions in the actual body of the Agreement that an applicable

### C. Effective Notice of Termination

Having determined that the parties did not intend the MANA Code of Ethics as binding, the Court must determine whether Worx breached the Agreement in refusing to pay commissions to Maverick. This implicates several terms of the Agreement, the first of which is paragraph 8's mandate of written notice by mail, which modifies paragraph 6's termination language.

The Agreement provides as follows:

> 6. **Term**. This Agreement shall continue in full force and effect until the date ("Termination Date") set forth in a notice given by one party to the other indicating such party's election to terminate this Agreement, which Termination Date shall be at least one hundred twenty (120) days after the date notice of such election is given. Alternatively, this Agreement may be terminated at any time by mutual written agreement between both parties hereto. If this Agreement shall terminate for any reason whatsoever, Agent shall be entitled to receive his full fees determined in accordance with provisions of Paragraph 4 with respect to orders solicited prior to the effective date of such termination, regardless of when such orders are accepted by Principal (provided Agent can demonstrate such orders were solicited prior to the effective date of such termination) and regardless of when such shipments are made or invoices rendered.
>
> ....
>
> 8. **Notices.** Any notice, demand or request required or permitted to be given hereunder shall be in writing and shall be deemed effective twenty-four (24) hours after having been deposited in the United States mail, postage pre-paid, registered or certified, and addressed to the addressee at his or its main office, as set forth below. Any party may change his or its address for purposes of this agreement by written notice given in accordance herewith.

Maverick claims that it is entitled to commissions in accordance with paragraph 6 because it successfully solicited Wal-Mart's business before the "Termination Date," which was 120 days

---

rule of construction would resolve the ambiguity by disregarding the latter provision. *See Coble Systems, Inc. v. Gifford Co.*, 627 S.W.2d 359, 363 (Tenn. Ct. App. 1981).

after the disputed date of notice of termination.[27]  Worx, however, never responds to Maverick's assertion that the Agreement was never terminated; instead, Worx simply restates on its own theory of the date of termination.  Paragraph 8 clearly provides that any notice required by the Agreement is effective 24 hours after it is deposited in the United States mail.  Apparently, Worx rests on the contention that Abarca's emails and attached letter, on their own, constitute effective notice under the Agreement.  They do not.

Nevertheless, Maverick waived its right to effective notice.  Justice (then, Judge) Koch, writing for the Tennessee Court of Appeals, wrote that "strict compliance with contractual requirements or conditions may be waived by the party in whose favor they were made . . . .  Thus, a party may waive its contractual right to receive written notice."[28]  Furthermore, "[t]he waiver need not be express to be effective.  It is sufficient if a party's conduct evidences an intent to relieve the other of its duty to comply strictly with the contract.  For example, remaining silent when one is expected to speak may later result in an estoppel."[29]  After the February 8, 2009 email, which Worx contends terminated the contract, Garrison responded that he had no intention of terminating the Agreement, but did not mention the defective notice.  Additionally, Maverick has not presented any evidence that it objected to the form of notice after Abarca sent the March 10, 2009 email purporting to terminate the contract.  Maverick treated the second purported termination email as terminating the contract, did not object, and has not presented any

---

[27] The Court notes that although Maverick makes the argument that the Agreement was never terminated (an argument taken up by the Court in this section), Maverick also clearly states that "Abarca terminated the Agreement on March 10, 2009 . . . ."  Maverick's Mem. in Supp. Mot. Summ. J. 14, ECF No. 58.

[28] *Writzman v. Baust*, 1988 Tenn. App. LEXIS 671, at *6–7 (Tenn. Ct. App. Nov. 2, 1988) (citations omitted).

[29] *Id.* at *7 (citations omitted).

evidence that it has ever objected to the form of the notice or that it considered the form a breach by itself.  Thus, Maverick relieved Worx of its duty to send written notice by U.S. mail.

### D.  Termination

The date on which Worx effectively terminated the Agreement bears contractual significance, as Maverick's right to commissions is based on the defined "Termination Date"— 120 days after notice of termination.  Worx argues that it terminated the Agreement by letter— attached to a later email—on February 2, 2009.  The letter from Abarca states that Worx "has changed its sales and marketing strategies, especially the ones that deal with WORX's channels of distribution."  It also provides that Maverick's "current relationship with WORX will change so [Maverick] can act as a distributor and an independent sales representative."  Then, Abarca purports to give notice of termination:

> First, we are giving you official notice that the current relationship is terminated as of the 2nd of June of 2009. This is based on the first sentence of clause 6 Term of the current agreement between WORX and Maverick Group Marketing.  I have copied the clause below for ease of reading.  Second, based on the second sentence of the same clause 6 Term, I would like both of us to terminate this agreement by mutual consent immediately.  This will allow us to start working on a new agreement with new guidelines, promotions, and sales initiatives to grow both of our business [sic].[30]

At first glance, the letter seems to terminate the agreement.  But in a second email, dated February 9, 2009, Abarca discussed how Maverick would be compensated, and then wrote the following:

> Thank you for your offer of coordinating the meeting with Wal-Mart, I think that I will be alright.  In the meantime, and according to the current agreement between Maverick Group and WORX

---

[30] Letter from Sergio Abarca to John Garrison (Feb. 2, 2009), ECF No. 60-2, PageID 594.

Environmental Products, we need to decide whether we terminate immediately the current relationship by mutual consent, or I will give you notice of termination effective 120 days from today's date [February 9, 2009].

Again, once I learn the scope of the business with Wal-Mart, if it ever happens, the time it will take to implement it, and the potential size of the business, I will then discuss with you, under a new agreement, the scope of the relationship between WORX and Maverick Group. Of course, you may want to completely end the business relationship between our two companies. WORX will respect and understand that position.[31]

Garrison responded an hour later:

Originally, the agreement between Maverick Group and WORX was set up specifically for developing the Walmart business due to Maverick Group's contacts and business relationship with Walmart. Therefore, I have no interest in terminating our agreement. I have not abandoned, nor will I abandon my efforts toward gaining the Walmart business for WORX unless I am instructed to do so by WORX through termination of our agreement.[32]

The same day, February 9, 2009, Abarca responded with the following:

[P]lease understand that I am not trying to terminate the relationship with your company with regard to any business you are doing for WORX, whether is [sic] Wal-Mart or any other prospect you may have. WORX needs to modify the current contractual agreements we have with Maverick Group and any other company acting like your company. First, kindly, you need to return the inventory you have as per the instructions of the letter. Second, you need to carefully read the letter that sent [sic]. I stated we need to draft a different agreement. *Had I decided to terminate the agreement that WORX and Maverick Group has I would have*

---

[31] Email from Sergio Abarca to John Garrison (Feb. 9, 2009, 12:02 PM), ECF No. 60-7, PageID 850–51.

[32] Email from John Garrison to Sergio Abarca (Feb. 9, 2009, 1:12 PM), ECF No. 60-7, PageID 850.

> *done so just by following the termination clause in the contract.*
> *Moreover, I could have done that many months ago. . . .*[33]

Abarca's statement—that if he *had* decided to terminate Maverick and Worx's agreement, he would have simply "follow[ed] the termination clause in the contract" and that he "could have done that many months ago"—is a plain admission that Worx had not unilaterally terminated the Agreement as of that date, regardless of what Abarca's previous letter stated. Whether the proposal sought modification of the contract or some new relationship is irrelevant for purposes of the Agreement: such modification never occurred. But Abarca's specific statement that he was not terminating the Agreement, in response to Garrison's announcement that he had no interest in terminating the Agreement, leaves no genuine dispute that the Agreement was not legally terminated as of February 9, 2009.

On March 10, 2009, Garrison emailed Abarca updating him on the status of his contacts with Walmart. Abarca responded first by thanking Garrison. Then, he wrote that "the services from Maverick Group are no longer needed. According to clause six of the agreement Maverick Group has with WORX . . . your services are terminated."[34] In compliance with paragraph 6 of the agreement, Abarca wrote that "effective July 10, 2009, the business relationship between Maverick Group and WORX . . . is terminated. Please abstain from approaching Wal-Mar [sic] on WORX's behalf immediately."[35] Maverick acknowledges that this March 10, 2009 email

---

[33] Email from Sergio Abarca to John Garrison (Feb. 9, 2009, 2:44 PM), ECF No. 60–7, PageID 850 (emphasis added).

[34] Email from Sergio Abarca to John Garrison (Mar. 10, 2009 10:40 AM), ECF No. 60-7, PageID 853.

[35] *Id.*

constituted effective notice of termination.[36]   Thus, since the February 2, 2009 letter was

ineffective for termination, Worx terminated the Agreement on March 10, 2009.[37]   This

necessarily means that the Termination Date, as defined by the contract, is 120 days after the

date of notice, which both parties agree is July 10, 2009.[38]

### E.  "Orders Solicited"

Maverick's claim for commissions is based on paragraph 6 of the Agreement, set forth in

full above, which provides in pertinent part,

> . . . .  If this Agreement shall terminate for any reason whatsoever,
> Agent shall be entitled to receive his full fees determined in
> accordance with provisions of Paragraph Four with respect to
> orders solicited prior to the effective date of such termination,
> regardless of when such orders are accepted by Principal (provided
> Agent can demonstrate such orders were solicited prior to the
> effective date of termination) and regardless of when such
> shipments are made or invoices rendered.

Paragraph 4 reads as follows:

> 4.   **Agent's Commission**.  The commissions payable by Principal
> to Agent on orders solicited within or delivered to the Territory
> shall be 8% ("Commission Rate").  Commissions shall be deemed
> earned by Agent upon acceptance or delivery of the order by
> Principal, whichever occurs first.  Commissions earned by Agent
> shall be computed on the net amount of the invoice rendered for
> each order or part of an order, exclusive of freight and
> transportation costs (including insurance), normal and recurring

---

[36] *See* Maverick's Mem. in Supp. of Mot. Summ. J. 14, ECF No. 58 ("Abarca terminated
the Agreement on March 10, 2009); Maverick's Statement of Undisputed Facts ¶¶ 58, 59
(describing Abarca's email as "Abarca's termination email on March 10, 2009" and stating "[o]n
March 25, 2009, just 15 days after terminating Maverick").

[37] Worx has argued only that February 2 was the date for termination.  It points to no
correspondence showing effective termination between February 2 and March 10.

[38] By the Court's count, July 8, 2009, is the date 120 days from March 10, 2009.
Nevertheless, Abarca stated in his email that the Termination Date was July 10, 2009.  Neither
party has alluded to the earlier date in any pleading; therefore, the Court assumes that the
Termination Date is July 10, 2009.

> bona fide-trade-discounts and any applicable sales or similar taxes. All commissions earned by Agent shall be due and payable to Agent on or before the twentieth (10th) [sic] date of the month immediately following the month during which the remittance applicable to an order is received by Principal.

The parties' dispute boils down to the interpretation of "orders solicited." Maverick argues that it was "undoubtedly 'soliciting' Wal-Mart for orders prior to Worx's wrongful termination on March 10, 2009,"[39] and therefore it is entitled to commissions on Worx's eventual securement of Wal-Mart business. Worx, on the other hand, argues that Worx is not entitled to commissions "because the clear and plain language of the Agreement provides for the payment of commissions only on orders solicited," and "Maverick did not solicit any orders."[40] Thus, the Court must interpret the meaning of "orders solicited" in the Agreement and determine, in light of the that interpretation, whether Maverick did indeed solicit orders within the 120-day post-termination period.

The operative term "orders solicited," which triggers Maverick's right to receive commissions in the post-termination period, is "of uncertain meaning and may be fairly understood in more ways than one."[41] "Solicit," although a key word in purpose of the Agreement, is not defined. In its ordinary sense, "solicit" means "to petition to" or "to approach with a request or plea." Thus, taking this meaning as determinative, the Court would have to rule, as a matter of law, for Maverick: no dispute exists that Maverick indeed petitioned Wal-Mart for business. But the multiple citations to the term throughout the Agreement render its meaning ambiguous, subject to more than one reasonable interpretation.

---

[39] Maverick's Response in Opp'n to Worx's Mot. Summ. J. 11, ECF No. 62.

[40] Worx's Mem. in Supp. Mot. Summ. J. 6, ECF No. 56-1.

[41] *Memphis Housing Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001).

The Agreement granted Maverick, as Worx's sales representative, the right "to solicit orders" for "[Worx's] goods, equipment and/or services."[42] The Agreement provides that Worx would set "prices, charges and terms of sale" and that "[o]rders for Products solicited by Agent shall be forwarded to and subject to acceptance by the Principal."[43] Maverick would earn commissions "on orders solicited within or delivered to the Territory," and those commissions would be "deemed earned by Agent upon acceptance or delivery of the order by Principal, whichever occurs first."[44] Thus, if the Court were to interpret the Agreement based on these references to "orders solicited" alone, it would be equally reasonable to infer that the parties intended that Worx's acceptance of a physical "order" from a third party would trigger Maverick's right to a commission. On the other hand, paragraph 6—the "Term" paragraph—states that the Maverick

> shall be entitled to receive [its] full fees determined in accordance with provisions of Paragraph Four with respect to orders solicited prior to the effective date of such termination, *regardless of when such orders are accepted by the Principal* (provided Agent can demonstrate such orders were solicited prior to the effective date of such termination) *and regardless of when such shipments are made or invoices rendered.*

While referencing paragraph 4's language ("deemed earned by Agent upon acceptance or delivery of the order by Principal, whichever occurs first"), paragraph 6 could reasonably be interpreted as implying that "orders solicited"—at least in the context of termination—means something other than ("regardless of") (1) acceptance by the Principal, (2) shipments made, or (3) invoices received.

---

[42] Marketing Agency Agreement ¶ 1, ECF No. 61-1.

[43] *Id.* ¶¶ 2, 3.

[44] *Id.* ¶ 4.

When orders are "solicited" under the Agreement, then, is ambiguous.  A reasonable jurist could read the Agreement as providing that orders are "solicited" at some point when an order is solidified as a result of the agent's pursuit.  This interpretation stems from paragraph 6's convoluted description of when Maverick would be entitled to commissions.  This interpretation would also protect Maverick from the "back-door selling" it alleges, giving it the right to commissions for orders "solicited" as a result of its endeavors but after termination.  Likewise, another jurist could reasonably interpret "orders solicited" as requiring an actual order of goods from Wal-Mart, regardless of the way that Wal-Mart generally does business—through so-called "award letters" and grants of large contracts.  This interpretation would protect Worx's right to terminate the Agreement if it came to believe that Maverick was not meeting expectations.  Both interpretations are equally plausible from a reading of the four corners of the document.  After determining the existence of ambiguity from the language of the contract, the Court must "employ established rules of construction to determine whether the ambiguity remains in the instrument."[45]

Applicable common-law rules of construction do not resolve the ambiguity.  The implicated paragraphs are not so repugnant as to require the exclusion of the "orders solicited" language in the latter paragraph 6.  Even construing the provision against the drafter, "orders solicited" remains ambiguous and does not automatically entitle Maverick to commissions.  For example, assuming that paragraph 6's "regardless" language does mean that commissions under paragraph 4 may be earned at some point before acceptance, shipment, or the rendering of an

---

[45] 21 Steven W. Feldman, Tenn. Practice Series: Contract Law and Practice § 8:66; *see also Planters Gin. Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) ("Where the terms of the contract are ambiguous, the intention of the parties cannot be determined by a literal interpretation of the language, and the courts must resort to other rules of construction.").

invoice, a question still lingers: what event must have occurred to deem that Maverick had "solicited" an order such that it was entitled to a later commission? Nevertheless, interpreting the very same "regardless" language, a reasonable jurist could still determine that the parties intended solicitation to be an earlier event that solidified business.

Finally, the first and most important rule of construction is that the intent of the parties must prevail.[46] The Court cannot determine the intent of the parties as to "orders solicited" from the language of the Agreement or from applying applicable rules of construction. Thus, the Court **DENIES** both parties' motions for summary judgment as they relate to whether Maverick is entitled to commissions on orders that it may or may not have "solicited." It is more appropriate to proceed to trial, where both parties may present evidence "'to explain ambiguous terms.'"[47] Although the term is susceptible to more than one interpretation, the parties, at the time of contracting, intended for one meaning to control. The Court declines to rule on the ambiguous term at summary judgment and instead waits until trial to "use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision," which will "guide the court in construing and enforcing the contract."[48] Although Maverick has submitted evidence of Worx's endorsing party's intent, that endorser is no longer employed by Worx. The Court will not make credibility determinations from a cold docket of disputed facts at this stage of litigation.

---

[46] *See Coble Systems, Inc. v. Gifford Co.*, 627 S.W.2d 359, 363 (Tenn. Ct. App. 1981) (citing *Ohio Cas. Co., Inc. v. Travelers Indemnity Co.*, 493 S.W.2d 465 (Tenn. 1973)).

[47] *Allstar Consulting Grp. v. Trinity Church & Christian Ctr.*, No. W2006-00272-COA-R3-CV, 2007 Tenn. App. LEXIS 23, at *12 (Tenn. Ct. App. Jan. 18, 2007) (citing *Golden Constr., Inc./CFW Constr. Co. v. E. Luke Greene Caulking Contractors*, No. 54, 1987 WL 18061, at *1 (Tenn. Ct. App. Oct. 9, 1987)).

[48] *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006).

### III. Unjust Enrichment and Procuring Cause

Worx also moves for summary judgment on Maverick's unjust-enrichment claim, arguing that unjust enrichment "is generally not available if a valid and enforceable written contract governs the subject matter in issue between the parties."[49]  The parties agree that the Agreement is enforceable.  Each party submits its own reading of "orders solicited" in the Agreement, and the Court, acting as fact finder, will determine the intent of the parties at the time of contracting in light of testimony and evidence presented at trial.  Thus, whether Maverick is ultimately successful on its breach-of-contract claim has no relevance, as the existence of an enforceable contract vitiates its ability to proceed under a theory of unjust-enrichment.  Put simply, the Court will not imply a quasi-contract "where a valid contract exists on the same subject matter."[50] Worx's Motion for Summary Judgment on Maverick's unjust-enrichment claim is **GRANTED**.

Arguments related to the procuring cause doctrine are premature.  Even in its natural setting—real-estate listing agreements—the doctrine is inapplicable when the parties have included terms in their contract defining the circumstances under which a broker is entitled to a commission:  "Where contracting parties agree upon the detailed circumstance under which a broker is entitled to a commission after the expiration of a listing agreement, the contractual language setting forth those rights and duties will control."[51]  Here, the parties agreed to certain

---

[49] *Ridgelake Apartments v. Harpeth Valley Utils. Dist.*, No. M2003-02485-COA-R3-CV, 2005 Tenn. App. LEXIS 210, at *25 (Tenn. Ct. App. Apr. 8, 2005).

[50] *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App.  1991).

[51] *Crye-Leike, Inc. v. Carver*, 415 S.W.3d 808, 819 (Tenn. Ct. App. 2011) (citing *Grubb & Ellis/Centennial, Inc. v. Gaedeke Holdings, Ltd.*, 401 F.3d 770, 774 (6th Cir. 2005)).

terms defining when Maverick would be entitled to commissions.[52]   The Court, as factfinder, will determine what those terms mean without an initial inquiry into the "procuring cause."  Only if extrinsic evidence fails to elicit the true meaning of the terms in the Agreement will the Court even consider the procuring cause doctrine.

## IV. Worx's Counterclaims

Maverick seeks summary judgment on all of Worx's counterclaims.  Worx's Amended Counterclaim alleges three causes of action:  (1) breach of contract, (2) misrepresentation, and (3) fraud.

### A.  Breach of Contract

Under Tennessee Law, "[t]he essential elements of any breach of contract claim include (1) the existence of an enforceable  contract, (2) nonperformance amounting to breach of the contract, and (3) damages caused by the breach of contract."[53]  Worx alleges that Maverick "materially breached its obligations under the Agreement by failing to adequately and timely perform marketing services to solicit orders for Worx's goods, equipment and/or services on behalf of Worx."[54]  As a result of Maverick's alleged failure to perform marketing services and solicit orders, Worx claims that it lost business opportunities, incurred fees, costs, and other expenses.  In its Response, Worx relies on Maverick's failure to "produce one single order in the

---

[52] Maverick admits in its Response that it could only pursue the procuring-cause-doctrine argument "if the Agreement is declared irredeemably ambiguous."  Maverick's Response to Worx's Mot. Summ. J. 19, ECF No. 62.

[53] *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006) (quoting *ACR LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).

[54] Worx's Answer and Am. Counter-Compl. ¶ 33 , ECF No. 24.

two years of the Agreement prior to termination."[55]  But Worx fails to set forth a single provision of the Agreement that Maverick breached.  The Agreement states that Worx "is interested only in the results obtained by Agent [Maverick], who shall have sole control of the manner and means of performing under this Agreement."[56]  Worx assumed the risk of Maverick's alleged failure to solicit an order, and it offset this risk by providing only for commissions.  Without pointing to a single provision of the Agreement that Maverick breached, Worx's breach-of-contract claim fails.

### B.  Misrepresentation and Fraud

#### 1.  Choice of Law

Neither party has briefed the Court on its choice of law as to the torts of misrepresentation and fraud.  A federal court sitting in diversity applies the choice-of-law rules of the forum state.[57]  For tort cases, Tennessee follows the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws.[58]  Under the approach, the law of the place of injury will normally apply unless another state has a more significant relationship to the occurrence and the parties.[59]  In analyzing the relationship, Tennessee courts take into account

---

[55] Worx's Response in Opp'n to Maverick's Mot. Summ. J. 11, ECF No. 64.

[56] Marketing Agency Agreement ¶ 5, ECF No. 61-1.

[57] *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009).

[58] *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 474 (Tenn. Ct. App. 2003) (citing *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)).

[59] Other Restatement sections treat individual torts, providing a default rule for the specific tort in question.  For example, for fraud and misrepresentation, section 148 provides that if the misrepresentation and the action in reliance occurred in the same state, that state's law applies.  Restatement (Second) of Conflict of Laws § 148(1).  It then provides that, as here, "if the plaintiff's action in reliance [on the misrepresentation] took place in whole or in part in a state other than that where the false representations were made," the forum is to consider other

several contacts listed in Restatement section 145, which explains the guiding principles for torts.[60] These contacts include (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship between the parties is centered.[61] The Court considers all of the contacts "according to their relative importance with respect to the particular issue."[62]

The Court assumes that the parties failed to brief the choice-of-law issue in reliance on the quality of the fourth contact. The relationship between the parties is centered in Tennessee, as the contract governing their relationship is subject to the laws of Tennessee. Regardless of other contacts and in light of the parties' apparent concession that Tennessee law governs the tort causes of action, the Court applies Tennessee law.

### 2. Misrepresentation

In support of its claim for misrepresentation, Worx alleges that "Maverick represented and warranted that its services were of a certain quality or character and that they were able to perform and solicit certain customers, including Wal-Mart, for the benefit of Worx," and that

---

contacts. *Id.* § 148(2). The Court is unaware of any Tennessee court's treatment of section 148, but courts appear to rely upon section 145's general factors for most torts.

[60] *Gov't Emps. Ins. Co. v. Bloodworth*, No. M2003-02986-COA-R10-CV2007, Tenn. App. LEXIS 404, at *84 (Tenn. Ct. App. June 29, 2007).

[61] *Hataway*, 830 S.W.2d at 59 (citing Restatement (Second) of Conflict of Laws § 145 (1971)).

[62] Restatement (Second) of Conflict of Laws § 145 (1971).

"Maverick submitted false reports to Worx."[63]  Worx alleges that it relied on these false representations to its detriment and suffered damages.

Under Tennessee law, a claim for intentional misrepresentation has six elements:

> (1) that the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation.[64]

In its Motion for Summary Judgment, Maverick asserts that Garrison had worked with Wal-Mart, had over 39 Wal-Mart contacts, and had represented another corporation to Wal-Mart. Furthermore, Maverick presents evidence from a Senior Manager at Wal-Mart who "verified" that Garrison had a long and beneficial relationship with Wal-Mart.  Thus, Maverick asserts, it did not misrepresent its relationship with Wal-Mart.

Worx counters—in a conclusory paragraph—that the Senior Manager had no involvement in the purchase of Worx products for Wal-Mart.  Furthermore, Worx argues that Zach Freeze, the ultimate buyer of Worx products, could not recall Garrison.  But neither of these assertions contradicts Garrison's sworn statement that he had numerous Wal-Mart contacts when he entered into a business relationship with Worx.[65]  Maverick sets forth clear evidence that Maverick had contacts at Wal-Mart and sent hundreds of emails to Wal-Mart in representing Worx.  Presented with this evidence, Worx did not seek to rebut Garrison's sworn statement.  Its

---

[63] Am. Counter-Compl. ¶ 39, ECF No. 24.

[64] *Stanfill v. Mountain*, 301 S.W.3d 179, 188 (Tenn. 2009) (quoting *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008)).

[65] Aff. of John Garrison ¶ 14, ECF No. 59-1.

attempt to "show that there is some metaphysical doubt as to material facts" is not enough to survive summary judgment.[66]  Worx's tort claim is simply another iteration of its displeasure with Maverick's alleged failure to perform under the contract.  There is no genuine dispute that Maverick did not misrepresent an existing or past fact.  Thus, Worx's misrepresentation claim fails.

### 3.  Fraud

Worx's final counterclaim alleges that Maverick, through its sole shareholder Garrison, attempted to materially alter the Agreement.[67]  Specifically, Worx alleges that Garrison changed the material terms of the Agreement, added an Addendum that was not part of the original Agreement, and attached the signature page of the original Agreement to the altered agreement.  This, Worx claims, constitutes "fraud."  Under Tennessee law, a plaintiff must prove four elements of fraud:  "(1) an intentional misrepresentation of a material fact, (2) knowledge of the representation's falsity, (3) an injury caused by reasonable reliance on the representation, and (4) the requirement that the misrepresentation involve a past or existing fact."[68]

First, the Court must note that both parties concede that the February 12, 2007 Agreement binds the parties.  Nevertheless, Worx—after arguing for a specific interpretation of the Agreement, arguing that Maverick breached the Agreement, and claiming that Maverick is not entitled to commissions under the Agreement—asserts that "a dispute exists as to the authenticity

---

[66] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[67] Am. Counter-Compl. ¶ 46, ECF No. 24.

[68] *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 40 (Tenn. Ct. App. 2006) (citing *Dobbs v. Guenther*, 846 S.W.2d 270, 274 (Tenn. Ct. App. 1992)).

of the Agreement."[69]  Moreover, in its answer to Maverick's complaint, Worx frequently "denies the authenticity and validity of the Agreement attached to the Amended Complaint as Exhibit A."[70]  But Worx does "admit[] that it entered into an Agreement with Maverick on or about February 12, 2007."[71]  Thus, from the pleadings, it appears that Worx's fraud claim does not allege that the Agreement is unenforceable.  Instead, Worx bases its fraud claim on Maverick's alleged provision of "two different altered and modified versions of agreements, with each differing and changing the meaning of the Agreement."[72]  Worx then states summarily that it relied on Maverick's misrepresentation and suffered damages as result.

When Abarca took over at Worx, Garrison emailed Abarca, attaching "a copy of the Agency Agreement [Maverick had] on file for WORX," as well as his resume to "establish a record of [his] experience with . . . WORX."[73]  The attached "Agency Agreement" bears four differences from the actual February 12, 2007 Agreement.  First, the original Agreement states that the due date of commission payments is the "twentieth (10th)," while the "altered" agreement sent to Abarca shows "twentieth (20th)."  Second, the original Agreement shows an "8%" commission, while in the "altered" agreement, the "8%" is underlined.  Third, the "altered document" contains a reference to "Addendum A," which lists specific accounts, in the first paragraph.  The original Agreement does not contain a reference to "Addendum A," although Worx claims, fourth, that the Addendum listing company accounts in the "altered" agreement

---

[69] Worx's Response in Opp'n to Maverick's Mot. Summ. J. 13, ECF No. 64.

[70] *See* Answer to Second Am. Compl. ¶¶ 13–15, ECF No. 42.

[71] *Id.* ¶ 12.

[72] Worx's Response in Opp'n to Maverick's Mot. Summ. J. 13, ECF No. 64.

[73] Email from John Garrison to Sergio Abarca (Sept. 6, 2007, 2:53 PM).

contains names of companies that are different from the companies in the original Addendum A. This, Worx alleges, constitutes fraud. In countering Maverick's Motion for Summary Judgment on this issue, Worx states that "a reasonable person could conclude, based on the inconsistent documents, that Maverick intentionally misrepresented that an Addendum was part of the Agreement. These facts . . . create a genuine issue of material fact as to whether Maverick knowingly made an intentional misrepresentation of material fact."[74]

Maverick asserts that these differences arise from "differences between the final, signed Agreement and other unsigned drafts."[75] Essentially, Garrison mistakenly sent Abarca a previous draft of the Agreement, rather than the signed Agreement. But changes in underlining in this case could in no way have caused injury to Worx. Likewise, the "alteration" of "10th" to "20th" for commission due-dates did not cause injury to Worx. Indeed, Worx has not presented any facts showing injury as a result of any of the changes. As to the Addendum, even assuming that Garrison intentionally misrepresented a past, material fact by sending a different copy of the agreement, Worx has not rebutted Maverick's motion with any evidence that it somehow relied on this misrepresentation or that it was injured in any way.[76] Instead, Worx summarily states that a genuine issue of material fact exists as to fraud, all the while affirming that "the relevant provisions, Paragraph Four (4) and Six (6) are the same in each version."[77] Worx presents no evidence that it relied on some altered agreement, nor does it show how it was injured. This is

---

[74] Worx's Response to Maverick's Mot. Summ. J. 14, ECF No. 64.

[75] Maverick's Mot. Summ. J. 16, ECF No. 58.

[76] *Id.* at 17 ("[T]he differences between the signed Agreement and the drafts are neither 'material' nor 'injurious' to Worx. Worx 'admits that it entered into an Agreement with Maverick on or about February 12, 2007 . . . .'").

[77] Maverick's Statement of Undisputed Facts 2 n.1, ECF No. 56-2.

not enough to pass summary judgment, and Worx's fraud claim fails as a matter of law. All of Worx's counterclaims having failed as a matter of law, Maverick's Motion for Summary Judgment as it relates to Worx's counterclaims is **GRANTED**.

## V. Other Issues

### A. Laches

Maverick asks the Court to rule as a matter of law that Worx's laches defense does not apply to Maverick's action at law for breach of contract.[78] Maverick argues that the defense of laches only applies to equitable actions. But Tennessee law provides that "equitable defenses may bar purely legal claims."[79] A party asserting laches as a defense "must show 'an inexcusably long delay in commencing the action which causes prejudice to the other party,' and mere delay will not suffice."[80] Furthermore,

> [a] finding of sufficient prejudice frequently follows from "the death of witnesses[,] . . . the loss of evidence," . . . or "failure of memory resulting in obscuration of facts" which "render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence."[81]

---

[78] In its Response, Worx withdrew its affirmative defense regarding the statute of limitations for breach of contract but did not abandon its defense of laches. Worx's Response in Opp'n to Maverick's Mot. Summ. J. 14, ECF No. 64.

[79] *M.J. Jansen v. Clayton*, 816 S.W.2d 49, 52 (Tenn. Ct. App. 1991); *see Baptist Physician Hosp. Org. v. Humana Military Healthcare Servs.*, 481 F.3d 337, 353 (6th Cir. 2007) (discussing Tennessee law); *see also Dennis Joslin Co. v. Johnson*, 138 S.W.3d 197, 201 (Tenn. Ct. App. 2003) (citing *Sutton v. Davis*, 916 S.W.2d 937, 940 (Tenn. Ct. App. 1995)).

[80] *Baptist Physician Hosp. Org.*, 481 F.3d at 353 (quoting *Patton v. Bearden*, 8 F.3d 343, 347 (6th Cir. 1993)).

[81] *Id.* (internal citation omitted) (first alteration in original) (citing *Brown v. Ogle*, 46 S.W.3d 721, 727 (Tenn. Ct. App. 2000)). Generally, for laches to bar a claim where the statute of limitations has not run, the plaintiff must be guilty of "gross laches." *Grand Valley Lakes Prop. Owners Ass'n v. Burrow*, 376 S.W.3d 66, 84 (Tenn. Ct. App. 2011).

In responding to Maverick's Motion for Summary Judgment, Worx points out Maverick's delay. Termination of the agreement occurred on July 10, 2009; Maverick filed this action in Shelby County Chancery Court on March 27, 2013—within Tennessee's six-year statute of limitations but almost four years after effective termination. Several witnesses are now deceased, although the impact of their absence on this legal action is unknown at this stage. Worx has presented a genuine dispute of material facts with regard to its affirmative defense of laches. Therefore, Maverick's Motion for Summary Judgment on this issue is **DENIED**.

### B. Proper Party

Worx concedes that Worx Environmental Products, Ltd., and Worx Environmental Products of Canada are proper parties. The parties have not presented enough evidence for the Court to determine the propriety of Worx Environmental Products, Inc., which Worx states "is not an existing U.S. or Canadian company."[82] If the issue is contested, the Court will address it at or before trial.

### C. Territory

Next, Maverick asks the Court to grant summary judgment against Worx on an issue of territorial limitation. Maverick claims it was not subject to any "Territorial Manager Agreement." In response to Maverick's purported undisputed fact that "[n]o territorial manager agreement exists between Worx and Maverick,"[83] Worx disputed the proposition, stating that although some documents were lost, others show that Maverick was limited to some territory.[84] While the parties have consistently relied on the Agreement as the document governing their

---

[82] Worx's Response in Opp'n to Maverick's Mot. Summ. J. 15, ECF No. 64.

[83] Maverick's Statement of Undisputed Facts ¶ 77, ECF No. 59.

[84] Worx's Response to Maverick's Statement of Undisputed Facts ¶ 77, ECF No. 65.

relationship, Maverick has not shown the absence of a genuine dispute in its two-paragraph argument. The Court simply does not have enough evidence before it to grant summary judgment on an essentially unbriefed issue. Thus, on this matter, Maverick's Motion for Summary Judgment is **DENIED**.

### D.  24-Store Test Results & "Freeze's Inability to Recall"

Maverick also seeks summary judgment on several purely factual issues:  whether the so-called "24-store test results" were lost or relied upon, and whether a particular witness—Zach Freeze—is credible.  Worx properly disputed both facts.  The Court will not resolve disputed factual issues at summary judgment, and Maverick's Motion on these bases is **DENIED**.

### E.  Damages

Finally, Maverick seeks summary judgment on damages, asking the Court to calculate potential damages before it renders a judgment on the substantive issues before it.  The Court declines to do so.  The amount of damages, if any, and the method of calculating such damages will be determined at trial.  Maverick's Motion for Summary Judgment as it relates to damages is **DENIED**.

### <u>CONCLUSION</u>

For the reasons stated above, the Court holds that Maverick's Motion for Summary Judgment as it relates to Worx's counterclaims is **GRANTED**.  Maverick's Motion for Summary Judgment on its own claims is **DENIED**, as is its Motion regarding the issues addressed in Part V of this opinion.  Finally, Worx's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: April 9, 2015.