IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

MAVERICK GROUP MARKETING, INC.,

    **Plaintiff,**

    vs.                        No. 2:13-cv-02268-STA-tmp

WORX ENVIRONMENTAL PRODUCTS LTD.
d/b/a/ WORX ENVIRONMENTAL PRODUCTS,
INC., and WORX ENVIRONMENTAL
PRODUCTS OF CANADA, INC. d/b/a/ WORX
ENVIRONMENTAL PRODUCTS, INC.,

    **Defendants.**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Maverick Group Marketing, Inc. ("Maverick"), filed this breach of contract lawsuit against Defendants Worx Environmental Products of Canada, Inc. d/b/a Worx Environmental Product, Inc., and Worx Environmental Products, LTD. d/b/a Worx Environmental Products, Inc. (collectively "Worx").[1] Worx filed a counterclaim, asserting that Maverick breached the agreement, misrepresented a material fact, and committed fraud. (ECF No. 24). The Court has jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332.

The case was tried by the Court without a jury on August 10-13, 2015. In accordance

---

[1] Maverick filed its complaint in the Chancery Court of Shelby County, Tennessee, and Worx removed the action to this Court. (ECF No. 1.)

with the Court's instructions, both parties have submitted proposed Findings of Fact and Conclusions of Law.[2] (ECF Nos. 117, 118.) The Court, having considered the evidence presented at trial, including its credibility determinations, the arguments of counsel, the relevant case law, and the entire record, makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.[3]

The following summary of the case was stipulated to by the parties in their Joint Pre-Trial Order: Maverick is owned and operated by John Garrison and serves as an agent for vendors. Worx manufactures an environmentally safe industrial-strength hand cleaner. Garrison and Brent Keeley of Worx executed a "Marketing Agency Agreement" ("the Agreement") on February 12, 2007. The Agreement provided for the payment of commissions to Maverick on "orders solicited" from vendors on behalf of Worx. Worx gave Maverick notice of termination of the Agreement on March 10, 2009, and termination was effective July 10, 2009. The Agreement forms the basis for this lawsuit which concerns whether Maverick is entitled to a commission and other damages for its work establishing Wal-Mart as a customer for Worx. (ECF No. 96 p. 2.)

## Findings of Fact

---

[2] On April 9, 2015, the Court granted Maverick's Motion for Summary Judgment on Worx's counterclaim and denied Maverick's motion as it related to its own claims. The Court also granted Worx's Motion for Summary Judgment on Maverick's unjust enrichment claim. (ECF No. 78.) Determinations made in the Order on Summary Judgment Motions are denoted as such in the present order.

[3] "In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a).

1. John Garrison has worked in the automotive industry since 1975 and has experience as a national sales manager with specialized markets. Prior to 2006, Garrison had solicited business from Wal-Mart on behalf of his vendor clients. It took him approximately two years to get one vendor client in with Wal-Mart.

2. Garrison dealt with the supplier side, i.e., goods not for resale ("GNFR"), with Wal-Mart.

3. Garrison had a good reputation in his dealings with Wal-Mart.

4. Jack Neufeld is the president, founder, and corporate representative for Worx.[4]

5. Garrison was introduced to Worx when he met Worx's then-Vice President Brent Keeley and then-Sales Manager Wes McInnes at a trade show in 2006.

6. Garrison began approaching Wal-Mart on Worx's behalf in December 2006 and had a meeting with personnel at Wal-Mart headquarters to introduce Worx's hand cleaner.

7. Maverick and Worx formalized their relationship on February 12, 2007, when they executed the Agreement. The Agreement was based on a form drafted by Worx and used by Worx with its other agents. Paragraph 1 of the Agreement "grants to Agent the right . . . to solicit orders for the Principal's goods, equipment and/or services."

8. Paragraph 4 of the Agreement provides:

> **Agent's Commission.** The commissions payable by Principal to Agent on orders solicited within or delivered to the Territory shall be 8% ("Commission Rate"). Commissions shall be deemed earned by Agent upon acceptance or delivery of the order by Principal, whichever occurs first. Commissions earned by Agent shall be computed on the net amount of the invoice rendered for each order or part of an order, exclusive of freight and

---

[4] Any evidence regarding securities-fraud charges against Neufeld and his charitable endeavors, whether admissible or not, is not relevant to the outcome of this matter.

3

transportation costs (including insurance), normal and recurring bona fide-trade-discounts and any applicable sales or similar taxes. All commissions earned by Agent shall be due and payable to Agent on or before the twentieth (10th) [sic] date of the month immediately following the month during which the remittance applicable to an order is received by Principal.

9. Paragraph 6 of the Agreement provides:

**Term.** This Agreement shall continue in full force and effect until the date ("Termination Date") set forth in a notice given by one party to the other indicating such party's election to terminate this agreement, which Termination Date shall be at least one hundred twenty (120) days after the date notice of such election is given. Alternatively, the Agreement may be terminated at any time by mutual written agreement between both parties hereto. If this Agreement shall terminate for any reason whatsoever, Agent shall be entitled to receive his full fees determined in accordance with provisions of Paragraph Four with respect to orders solicited prior to the effective date of such termination, regardless of when such orders are accepted by Principal (provided Agent can demonstrate such orders were solicited prior to the effective date of such termination) and regardless of when such shipments are made or invoices rendered.

Thus, under the Agreement, either party had the right to terminate the Agreement with or without cause with one hundred twenty days' notice. If the Agreement was terminated, Maverick would be entitled to payment "with respect to orders solicited prior to the effective date of termination."

10. Wal-Mart maintains a strict buying process which requires product presentations; supplier vendor registration; environmental, safety, and other tests; product registration; and item number creation.

11. Registering Worx as a supplier, obtaining a vendor number, testing, negotiating pricing, and item number creation were a necessary part of the process to develop Wal-Mart's business. These steps must be completed before an agent or manufacturer could be authorized to

4

begin soliciting Wal-Mart for an order. Thus, Worx and/or Maverick could not solicit an order from Wal-Mart until they had a Wal-Mart Supplier Agreement and a vendor number, had successfully completed testing, price was established for the product, and an item number was created.

12. Between 2006 and 2008, Maverick introduced Worx's All Natural Hand Cleaner product to Wal-Mart, sent numerous emails, made at least eight trips to meet with Wal-Mart buyers in Bentonville, Arkansas, and set up tests at Wal-Mart distribution centers and Tire and Lube Express Centers to establish a relationship with Wal-Mart for the benefit of Worx. Garrison invested significant time and money on behalf of Worx

13. Garrison stayed in regular contact with Wal-Mart's buyers Ott Bell, Douglas Miller, Don Nguyen, Rusty Wilber, and Zach Freeze.

14. Becoming a supplier for Wal-Mart was an arduous process, and there were delays during that process that were not the fault of either Maverick or Worx, including the high turnover rate of Wal-Mart's buyers, the fact that Worx's product was a different type hand cleaner and there was a lengthy education process associated with it, and Wal-Mart's tardiness in sending out satisfaction surveys after a twenty-four store test conducted by Maverick.[5]

15. Worx enlisted the consulting firm of George S. May to develop a new business plan and overall sales and marketing strategy. Sergio Abarca, a previous outside consultant, became Worx's Vice President in order to implement the suggestions and recommendations of May.

---

[5] Because the Agreement could be terminated with or without cause, there is no need for the Court to determine whether either party was at fault in delaying the process of obtaining Wal-Mart's business.

16. Abarca had no experience with Wal-Mart and initially praised Garrison's efforts in trying to get Worx into Wal-Mart. Later Abarca became critical of Garrison. On October 31, 2008, Abarca and Garrison exchanged emails wherein Abarca warned Garrison that Worx was not happy with Maverick's performance.

17. Worx obtained a Supplier Agreement from Wal-Mart and received a temporary vendor number for testing purposes on November 20, 2008.

18. In January 2009, Abarca contacted Buyers Wilber and Freeze directly because Neufeld had instructed Abarca to get personally involved in the negotiations with Wal-Mart.

19. On February 2, 2009, Worx sent Maverick a letter, attempting to change its business relationship with Maverick by implementing a new business plan and overall sales and marketing strategy. The new plan was presented to all Worx's agents and distributors, not just Maverick. Under the new plan, Maverick would become a distributor or Independent Sales Representative without any specific terms. Maverick did not agree to the new terms.

20. When Garrison appeared at a scheduled meeting with Freeze on February 16, 2009, at 10:00 a.m., he did not know that Abarca had scheduled his own meeting with Freeze for 9:00 a.m. that morning until he saw Abarca with Freeze just before 10:00 a.m. Abarca did not discuss what happened in his meeting with Garrison, but his notes from the meeting reflect that he told Freeze that he wanted "to learn as much as possible about the Wal-Mart buying process" and "would be personally working with him."

21. Worx gave Maverick notice of termination of the Agreement on March 10, 2009, and termination was effective July 10, 2009.

22. On March 25, 2009, Abarca and Freeze negotiated the price per unit for Worx hand cleaner based on a three-year contract and moved on to shipping costs.

23. By May 25, 2009, Worx had finished with the production of all the industrial dispensers that Wal-Mart needed for the hand cleaner.

24. As late as June 22, 2009, Wal-Mart and Worx were still discussing price when Freeze asked Abarca for the price of including a tray to prevent the product from falling to the floor.[6]

25. On July 2, 2009, Abarca announced that Worx had gotten a three-year contract with Wal-Mart.

26. Worx's item number was created on July 27, 2009.

27. On July 31, 2009, Wal-Mart ordered 3,118 cases of Worx and sent a Production Notice. Thus, Worx received its first order from Wal-Mart after the effective date of termination of the Agreement.

28. On August 25, 2009, Wal-Mart received shipments of Worx product.

29. On August 26, 2009, Wal-Mart drafted an Award Letter to Worx. The Award Letter set the price for a term of three years but was not a three year contract, despite Arbarca's July 2 statement, because Wal-Mart made no commitment to purchase any products from Worx. Instead, Wal-Mart issues stand-alone purchase orders for each order of Worx's products.

30. Worx did not pay its agents for their efforts, expenses, or their time in developing the business. Only "orders solicited" were compensable under the Agreement.

---

[6] Maverick did not negotiate price with Wal-Mart. While Garrison did send Freeze a proposed price by email, he had no further discussions or negotiations with Freeze.

31. The Wal-Mart Supplier Agreement and Award Letter were not orders.

32. Maverick did not make any demand or give any notice of a dispute under the Agreement until this lawsuit was filed in the Chancery Court on March 27, 2013.

33. Abarca died in May 2012. Rusty Wilber, one of Wal-Mart's buyers, is also deceased.

34. Garrison has received no compensation from Worx.

## Conclusions of Law

1. The Agreement is subject to the laws of Tennessee, and, therefore, the Court applies Tennessee law.[7]

2. In Tennessee, the party asserting a breach of contract claim must prove "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract."[8]

3. "[A] court's initial task in construing a contract is to determine whether the language of the contract is ambiguous."[9] If the contract is ambiguous, the Court must apply "established rules of construction to determine the parties' intent."[10] If a contractual provision is

---

[7] Marketing Agency Agreement ¶ 7 (ECF No. 61-1.)

[8] *Baker v. Baptist Mem'l Hosp.*, No. 2:08-CV-2619, 2013 WL 1405711, at *2 (W.D. Tenn. Apr. 5, 2013). *See also Life Care Centers of America, Inc., v. Charles Town Associates Ltd. Partnership*, 79 F.3d 496, 514 (6th Cir. 1996).

[9] *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002).

[10] *Id.*

"susceptible to more than one reasonable interpretation, [it] renders the terms of the contract ambiguous."[11]

4. The interpretation of a written contract is a matter of law.[12]

5. "The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern."[13] The parties' intent "is presumed to be that specifically expressed in the body of the contract."[14] "[T]he words expressing the parties' intentions should be given their usual, natural and ordinary meaning."[15] To aid the Court's discernment of the parties' intention, the Court may consider the circumstances surrounding the formation of the contract, the business to which the contract relates, and the construction placed upon the contract by the parties in carrying it out.[16] Parole evidence can be used to guide the Court in construing and enforcing the ambiguous terms.[17]

6. Maverick claims to be entitled to commissions based on the "orders solicited" provision in Paragraph 6 as quoted above. Maverick argues that it solicited orders from Wal-Mart prior to its termination and, regardless of when those orders came in, is entitled to

---

[11] *Id.*

[12] *Fisher v. Revell*, 343 S.W.3d 776, 779 (Tenn. Ct. App. 2009).

[13] *Planters Gin Co.*, 78 S.W.3d at 890.

[14] *Id.*

[15] *Taylor v. White Stores*, 707 S.W.2d 514, 516 (Tenn. Ct. App. 1985).

[16] *Simonton v. Huff*, 60 S.W.3d 820, 825 (Tenn. Ct. App. 2000); *Frank Rudy Heirs Assocs. v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn. Ct. App. 1997).

[17] *Allstate Ins. Co. v. Watson*, 195 S.W. 3d 609, 612 (Tenn. 2006).

commissions on Worx's eventual procurement of Wal-Mart's business. Maverick also contends that Worx entered into a contract with Wal-Mart during the 120 day termination period and is entitled to a commission for orders placed under that contract pursuant to the Agreement. Additionally, Maverick contends that Worx cut off its right to solicit orders during the 120 day termination period and that action constituted a breach of the Agreement. Finally, Maverick argues that Worx breached the good faith and fair dealings provisions of the Agreement.

7. Worx counters that Maverick merely solicited Wal-Mart's business on Worx's behalf and that no actual orders were solicited. Worx argues that orders were not solicited until Wal-Mart actually placed an order, which was outside the 120 day termination period. Under Worx's reasoning, Maverick is not entitled to any commissions under the Agreement.

8. As previously found by this Court,[18] the term "orders solicited" is ambiguous; therefore, the Court must interpret the meaning of that term as used in the Agreement and determine, in light of that interpretation, whether Maverick did indeed solicit orders so as to be entitled to the payment of commissions.

9. At the trial, both parties presented testimony as to the meaning of the term "orders solicited." Garrison testified that the term means "trying to get the business," and Keeley said that the term means "basically knocking on doors and going and trying to get orders for our product."[19] Maverick's expert, Robert Muenz, similarly testified that the term means

---

[18] Order P. Grt'ing & P. Dny'ing Mots. Summ. J. (ECF No. 78).

[19] The effect of this portion of Keely's testimony was lessened by his later testimony that Worx did not pay agents a commission for developing a relationship. Instead, they only got paid once they received an order.

"everything you do to try to get the business . . . from phone calls to emails to tests, to Power Point presentations, to appointments, to follow-ups."

10. The Court finds more persuasive the testimony of Worx's expert, Tyrone Burroughs, whose marketing company, First Choice Sales and Marketing Group, has represented manufacturers inside Wal-Mart for the last thirty years. Burroughs testified that securing a meeting with a Wal-Mart buyer, getting a Supplier Agreement and vendor number, and negotiating price are part of developing a business relationship with Wal-Mart and do not constitute soliciting an order. Only after an item number has been assigned and price agreed to can an order be solicited. In the opinion of Burroughs, Maverick developed a relationship with Wal-Mart but did not solicit an order and is not entitled to a commission.[20]

11. Additionally, in the email terminating the Agreement, Abarca wrote, "**If** any orders ever happened [sic] between today and the 10th of July, 2009, Maverick Group will be compensated . . . ."[21] Clearly, it was Abarca's understanding that an order had not been solicited prior to the termination date and that any order placed after July 10, 2009, would not entitle Maverick to a commission.

12. There are four steps in the process of soliciting an order from Wal-Mart. First, the business must have a supplier/vendor agreement[22] which is non-binding but sets out the terms of the relationship if an order is ever submitted and a vendor number. Second, there must be

---

[20] Burroughs testified that his company now charges an up-front consultation fee to compensate it for work done in establishing a business.

[21] Trial Exhibit 79 (emphasis added).

[22] The parties have used the terms "Supplier Agreement" and "Vendor Agreement" interchangeably.

product testing. Third, pricing must be agreed upon. And, finally, an item number must be issued by Wal-Mart. All four steps must have been completed before it can be said that an order was solicited.

13. A court should avoid a literal construction of a contract's terms if it would "lead to absurdity . . . when applied to the facts."[23] In the present case it would lead to an absurdity if the Court accepted Garrison's testimony that "orders solicited" merely means "trying to get the business." Using that definition would result in Maverick's being entitled to receive a commission after the initial meeting with Wal-Mart's buyer.[24]

14. Prior to the termination letter, a Supplier Agreement had been obtained and product testing had been done.[25] Although pricing had been discussed, it was not finalized until June 22, 2009, which is within the 120 day termination period. An item number was not issued until July 28, 2009, which is outside the 120 day termination period. After that, a stand-alone order was placed by Wal-Mart. Only then had an order been solicited.

15. Abarca's announcement on July 2, 2009, that Worx had gotten a three-year contract with Wal-Mart was based on the receipt of an Award Letter. The Award Letter was not a contract because it was not binding on Wal-Mart but, instead, was anticipatory of orders to be

---

[23] *Taylor v. Wilson*, No. 88-355-II, 1989 WL 49877, at *2 (Tenn. Ct. App. Apr. 26, 1989) (citing 17A *C.J.S.* Contracts § 294 (1963)).

[24] During Maverick's counsel's opening statement, he conceded that one phone call or one visit would not have entitled Maverick to a commission. However, he could not describe the steps that Maverick had to take to "solicit" an order within the meaning of the Agreement. Instead, he argued that the steps Maverick did, in fact, take amounted to "soliciting" an order.

[25] As late as March 3, 2009, one week before Maverick's termination, Zach Freeze emailed Garrison that Wal-Mart was "still debating where to go from here."

placed in the future. The Award Letter merely stated how much Worx would charge for its product for the next three years if Wal-Mart ordered the product, but Wal-Mart was not obligated to buy the product.

16. Pursuant to Paragraph 6 of the Agreement, Maverick was only entitled to a commission on "orders solicited prior to the effective date of such termination, regardless of when such orders are accepted by Principal (provided Agent can demonstrate such orders were solicited prior to the effective date of such termination)." "Soliciting an order" as used in the Agreement does not mean merely "trying to get the business." Instead, the term means getting a specific request for the purchase of products which did not happen in this case until the stand-alone order was placed on July 31, 2009, after the expiration of the 120 day termination period.

17. Maverick's argument that it could not solicit an order directly from Wal-Mart is not persuasive. Although Maverick is correct that the Award Letter states that "Wal-Mart policy prohibits suppliers from soliciting or receiving orders directly from Stores and Clubs," Maverick was not under an obligation to obtain an order from a specific store or club to be entitled to a commission but, instead, its efforts had to result in an order from Wal-Mart for the product before July 10, 2009. This did not happen and, therefore, Maverick is not entitled to any commissions under the Agreement.

18. Maverick contends that it should be credited with all solicitation efforts made by Worx during the 120 day termination period because Worx violated Maverick's right to solicit Wal-Mart's business when Abarca instructed Garrison to "abstain from approaching Wal-Mar [sic] on Worx's behalf immediately." Even if Maverick was "credited" with those efforts, as discussed above, an order was not actually solicited until the stand-alone order was placed on

July 31, 2009. Therefore, any "credit" that Maverick received would not entitle it to a commission. Because Maverick suffered no damages from Abarca's instruction to abstain from approaching Wal-Mart, the Court finds that the post-termination instruction did not breach the Agreement.[26]

19. Worx did not breach the implied duty of good faith and fair dealing in terminating the Agreement because Paragraph 6 specifically allows for termination by either party with or without cause. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement."[27] However, "[w]hat this duty consists of ... depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties...."[28] The implied duty of good faith and fair dealings cannot be breached by a party performing as "specifically allowed" by the contract.[29] Thus, termination of the Agreement, even if good cause did not exist, did not breach the duty of good faith and fair dealing because such termination was specifically allowed under the Agreement.

---

[26] To prevail on a breach of contract claim, the plaintiff must prove **all** of the following elements: (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) **damages caused by the breach of the contract**. *See ARC LifeMed, Inc. v. AMC–Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (emphases added).

[27] *Winfree v. Educators Credit Union,* 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995); *TSC Industries, Inc. v. Tomlin,* 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987).

[28] *Id.*; *see also Bank of Crockett v. Cullipher,* 752 S.W.2d 84, 91-2 (Tenn. Ct. App. 1988).

[29] *Id.*

20. Worx did not violate the duty of good faith and fair dealing by "stealing" the Wal-Mart account. Although Garrison made efforts to "get Wal-Mart's business," there was nothing in the Agreement to prohibit Worx from also contacting Wal-Mart's buyers in an effort to obtain an order more expeditiously.

21. Worx did not violate the duty of good faith and fair dealing by seeking to change the terms of the Agreement in February 2009. In a letter dated February 2, 2009, and sent by email to Garrison, Abarca stated that Worx "has changed its sales and marketing strategies, especially the ones that deal with WORX's channels of distribution." It also provided that Maverick's "current relationship with WORX will change so [Maverick] can act as a distributor and an independent sales representative." However, as previously determined by this Court,[30] whether the letter sought modification of the contract or some new relationship is irrelevant for purposes of the Agreement because such modification never occurred. Moreover, the proposed modification was the result of an across-the-board change in Worx's business relationships in dealing with manufacturer representations and was not directly targeted at Maverick.

22. In the alternative, Maverick claims to be entitled to a commission because it was allegedly the procuring cause of the order placed by Wal-Mart. Under the procuring-cause doctrine, an agent may be entitled to relief when the contract is ambiguous or silent on the issue as to when a commission is to be paid.[31] However, the procuring-cause doctrine is not an

---

[30] *See* Order P. Grt'ing and P. Dny'ing Mots. Summ. J., p. 15 (ECF No. 78.)

[31] *See Grubb and Ellis/Centennial, Inc. v Gaedeke Holdings Ltd.*, 401 F.3d 770, 774-79 (6th Cir. 2005); *see also Pacesetter Properties, Inc. v. Hardaway*, 635 S.W.2d 382 (Tenn. Ct. App. 1981).

additional requirement to be imposed on the parties' contract and is inapplicable when the parties have included terms in their contract defining the circumstances under which a broker is entitled to a commission.[32]

23. In this case, the procuring-cause doctrine does not apply because the Agreement provides a mechanism for payment of commissions before and after termination.[33]

24. In summary, the Court finds that Worx did not breach the Agreement by not paying commissions to Maverick because orders were not solicited prior to notice of termination or within the 120 day period after notice of termination.

25. Although there was testimony from the expert witnesses that withholding commissions from Maverick was wrong and that the moral thing for Worx to do would be to pay Maverick, "courts are concerned with just the legal obligations of contracts; the moral aspects are enforced in the 'forum of the conscience.'"[34] Accordingly, the Court finds that Worx does not have an enforceable moral duty to pay a commission to Maverick.

26. Alternatively, the equitable doctrine of gross laches bars any recovery by Maverick. The defense of laches may be applied to claims filed before the statute of limitations only when there is "gross laches."[35] To successfully invoke the doctrine of laches, a defendant must show "an inexcusably long delay in commencing the action which causes prejudice to the

---

[32] *Grubb and Ellis/Centennial, Inc.*, 401 F.3d at 774.

[33] *See Crye-Leike, Inc. v. Carver*, 415 S.W. 3d 808, 819 (Tenn. Ct. App. 2011).

[34] 22 *Tenn. Prac. Contract Law and Practice* § 11:2.

[35] *Clark v. American Nat. Bank & Trust Co. of Chattanooga*, 531 S.W.2d 563, 572 (Tenn. Ct. App. 1974).

other party," and mere delay will not suffice.[36] Laches applies "only in such cases where the loss of evidence, death of witnesses or parties, and failure of memory resulting in the obscuration of facts to the prejudice of the defendant, render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence."[37]

27. Maverick asserted its breach of contract claim within the six-year statute of limitations[38] but four years after its claim allegedly arose. Garrison testified that he delayed filing the lawsuit because he was initially in shock at the termination of the Agreement and then later he had trouble finding an attorney to take his case. Until the lawsuit was filed, Worx had had no communication with Maverick since the termination letter in March 2009.

28. The two key players in the events leading up to the termination of the Agreement were Garrison and Abarca, and Abarca was the sole key player in the post-termination events. Because Abarca died a year before the lawsuit was filed and a year before Worx had any notice that a lawsuit would be filed, Worx was forced to defend this action without access to his knowledge of what occurred. Although emails between Garrison and Abarca were recovered, Worx was without the benefit of background information or any explanation that Abarca could give concerning those emails.[39] Additionally, records that Abarca kept on his laptop and iPad

---

[36] *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 481 F.3d 337, 353 (6th Cir. 2007) (quoting *Patton v. Bearden,* 8 F.3d 343, 347 (6th Cir.1993)).

[37] *Brown v. Ogle,* 46 S.W.3d 721, 727 (Tenn. Ct. App. 2000).

[38] Tenn. Code Ann. § 28-3-109(a)(3).

[39] At one point during the trial, in response to a question by defense counsel as to why Abarca asked for a copy of a document, Garrison responded, "You would have to ask him that." TR. p. 329 (ECF No. 115 p. 23.)

17

could not be retrieved by Worx, further limiting Worx's ability to prepare its defense. A signed copy of the Agreement could not be found. Documents referencing a territory management agreement were found, but not the agreement itself.

29. Brent Keely, another defense witness, was difficult to locate, as were Wes Fowler and Wes McInnes.

30. Rusty Wilber, the Wal-Mart buyer who preceded Zach Freeze and who had knowledge of the process on Wal-Mart's end, was deceased. Even if Maverick did not know of the deaths of Wilber or Abarca until after the lawsuit was filed, Worx was prejudiced by those deaths in the preparation of their defense.

31. Additionally, the memory of Zach Freeze was impaired by the delay in the filing of the lawsuit. In his deposition taken for trial, Freeze made statements to the effect of "I don't recall" or "I don't remember" approximately seventy-nine times.

32. The doctrine of "unclean hands" does not prohibit Worx from raising the defense of gross laches because the Court has found that Worx did not "steal" the Wal-Mart order from Maverick and did not breach its duty of good faith and fair dealing.

33. The Court finds that Maverick's delay in bringing this action was not excusable and it inhibited Worx's ability to defend this case to such an extent that the doctrine of gross laches bars any recovery to which Maverick might be entitled.

34. Because the Court has found that Worx did not breach its contract with Maverick, there is no need to make a finding as to Maverick's territory under the Agreement. Consequently, Maverick's Motion in Limine to Limited Evidence Regarding Territorial Managers and Territorial Manger's Sales Agreement (ECF No. 91) is **DENIED** as moot.

35. The Court does not reach the issue of damages because Worx did not breach its contract with Maverick.

Accordingly, based on the above Findings of Fact and Conclusions of Law, the Court finds in favor of Defendant Worx, and judgment shall be entered in favor of Defendant.

Defendant Worx will have thirty (30) days from the entry of this order in which to file a motion for attorney's fees and costs. Maverick will then have thirty (30) in which to respond to Worx's motion.

**IT IS SO ORDERED.**

s **/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: December 7, 2015.